191 So. 649

**ROBINSON v. STATE.**

6 Div. 316.

Court of Appeals of Alabama.

June 30, 1939.

Rehearing Denied Oct. 3, 1939.

Beddow, Ray & Jones and J. Howard Perdue, Jr., all of Birmingham, and Pennington & Tweedy, of Jasper, for appellant.

Thos. S. Lawson, Atty. Gen., and Wm. N. McQueen, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

The appellant was tried in the court below upon an indictment which charged that he, unlawfully and with malice aforethought, but without premeditation or deliberation, killed Homer Collins Loveless by shooting him with a pistol.

Upon his arraignment in the court below the defendant interposed his plea of not guilty and throughout his trial insisted that he was justified in shooting the deceased, who, the defendant claimed, was then and there making an unjustified attack upon him, in the defendant's own home, and that, at the time he shot the deceased, he was in imminent danger of losing his own life, or of suffering great bodily harm, at the hands of the deceased, in a difficulty forced upon the defendant by the deceased, without fault on his part.

The defendant was convicted, in the court below, of the offense of manslaughter in the first degree, and was adjudged guilty of said offense in accordance with the verdict of the jury, and was thereupon sentenced, by said court, to imprisonment in the penitentiary for a term of three years, as fixed by the jury.

It is shown by the evidence in this case, without substantial dispute, that at the time of the alleged difficulty Mr. Loveless, the deceased, was a large and powerful man, weighing around 225 pounds, and that he bore the general reputation in the vicinity where he lived of being an overbearing, turbulent, high tempered and dangerous man, when drinking. The evidence also tended to show that the deceased was drinking, but not drunk, at the time of the fatal difficulty.

As to the defendant, the evidence shows that at the time he shot the deceased, he weighed around 150 pounds and that he had been previously convicted of the offense of receiving or concealing stolen property. There was no evidence that he was fussy, bloodthirsty or dangerous, or that he bore this reputation, whether drinking or not.

The evidence further shows that the difficulty between the defendant and the deceased occurred on the night of January 7, 1938, in the defendant's own home, and that at this time, and prior thereto, the relationship between them had been intimate, friendly and cordial. They spent the afternoon of the day of the difficulty, practically the entire afternoon, in driving around in an automobile with two of their friends, and did not return to Cordova, their home town, until about dark. When they did return they stopped at a cafe, then conducted by a sister-in-law of the defendant, of whom the defendant inquired as to the whereabouts of his wife. On being informed that his wife, in company with Mrs. Loveless, wife of the deceased, had departed for the defendant's home, he left his friends, saying that he was going for his wife and that he would return in a little while. He thereupon drove up to his house and not finding his wife at home, he immediately returned to the cafe, by another route, and there he found his wife who had returned, with Mrs. Loveless, during his absence. An oyster supper, at the defendant's house, was then arranged between the parties and before going to defendant's home they picked up Bart Harberson, who had been with the defendant and the deceased all of the afternoon, and also Miss Ethel Pate. The four men who had been together during the afternoon had been drinking, and, according to the testimony when they reached the house of the defendant, Harberson went directly into the living room, sat down, and went promptly to sleep. All of the parties went into the defendant's house upon their arrival. Loveless went into the living room and turned on the radio, while the defendant and the ladies of the party proceeded to prepare supper. It took some time to get the supper ready, but this was finally accomplished and the entire party, with the exception of Harberson, sat down at the table and ate their supper. Everybody was then, apparently, in a good humor and friendly with each other. While they were eating supper, or at some time during the evening, defendant was teasing, or joking, his wife about where she had been during the afternoon. She told him that she and Mrs. Loveless went to town by a certain route, which he contradicted and said that for all he knew they might have been out with some men. At this point Mrs. Loveless, fearing that her husband might not understand that defendant was simply teasing his wife, intervened in the conversation and undertook, herself, to describe the route she and Mrs. Robinson took when they walked down town. Here, so it appears from the testimony, Loveless began

to argue with his wife about the same matter. It appears from the testimony that all of this talk and raillery was mere banter and in good natured fun. And yet it was out of this perfectly harmless incident that the deplorable tragedy, in which Loveless lost his life, was made to emerge. As to this matter Miss Ethel Pate, a witness for the State, testified as follows: "I didn't hear it if anybody had said anything out of the way after we started supper until Collins and his wife got to arguing about which way the women came to town. *That was the first thing that started the row.* Collins and his wife didn't appear to be mad. Charlie (the defendant) *was laughing and going on.* Didn't any of them appear to be mad. When Collins' wife told him which way they went Charlie said 'you didn't go that way, we went that way and didn't see you.' He said he didn't meet them or overtake them. When Charlie said that Collins came running in there (the living room) and said 'you called my wife a liar' and started hitting Charlie and knocked him down in a chair and jumped on him * * *. When Collins first hit Charlie Elois (Mrs. Loveless) jumped up from the table and ran out of the back door. I say they went from the place in the living room, where Collins knocked him down, into the bed room, but I didn't see them in there. Charlie was in front and he was running and the other man (Mr. Loveless) was running after him. When they ran in this room here (meaning the bed room) I ran out and then went up to this second house and called Mr. Fielding and tried to get him down there."

It may be here said that there was evidence in behalf of the defendant which tended to show that Loveless did not make any outbreak for the defendant immediately after the defendant said "you didn't go that way, we went that way and didn't see you" and "we didn't meet you or overtake you," but that when the defendant made this remark Mrs. Loveless, who was standing by her husband, whispered something into his ear, and then Mr. Loveless ran in on the defendant. It may also be here further noted that the testimony of Mr. Fielding and of his wife, who were witnesses for the defendant, tended to show that after Mrs. Loveless and Miss Pate came to their home, while the difficulty between the deceased and the defendant was in progress, they both were there on these premises or in the street in front of the Fleming home until the shot was fired from which Mr. Loveless died.

The evidence further shows, without substantial dispute, that the deceased knocked the defendant down on his bed in defendant's bedroom, and that it was here that the defendant got his pistol. In the struggle in the bedroom the defendant's bed was broken down. The defendant struck the deceased with his pistol and in some way got free from the deceased and ran into the kitchen. The deceased followed the defendant into the kitchen and knocked him down again, or rather knocked him over on the hot stove, burning him, and as the defendant ran out of the kitchen the deceased seized a hatchet and threw it at the defendant and chased him back into the living room where he cornered the defendant and as he was here advancing on the defendant the latter shot the deceased in the leg and stopped him. The deceased fell to the floor and asked the defendant not to shoot him again, and the defendant immediately replied that he did not intend to shoot any more and that he would go and get a doctor to attend him. The testimony shows that the defendant did immediately go for a doctor and procured one to attend the deceased at the earliest possible moment. Unfortunately, so the testimony indicates, the pistol wound severed an artery in Loveless' leg and he died before the physician could reach him.

After a very careful consideration of all the evidence set out in this record, it is the opinion and judgment of this court that the defendant was free from fault in bringing on the difficulty in which the deceased lost his life, and that the defendant, in the light of the fury of the attack made upon him by the deceased and of the evident, imminent and impending danger to the life of the defendant, or of his suffering great bodily harm at the hands of his powerful and maddened assailant, who some of the evidence tends to show was a former prize fighter, was fully justified, under the rule of self defense, in shooting the deceased. The evidence shows that the deceased was actuated by an unreasonable and vicious rage against the defendant and that he either intended to kill the defendant, or to give him an unmerciful and brutal beating in his own home. The deceased chased the defendant from room to room in the defendant's own house, and gave him a serious and dangerous beating in the very presence of

his wife and neighbors, and proved himself a bully, deserving of his reputation, in his neighborhood, of being a dangerous, violent and blood thirsty man. The evidence shows that the defendant was knocked down by the deceased two or three times, that his face was bruised and bloodied and that a hatchet was hurled at him by the deceased with sufficient force to break in the ceiling of the kitchen. The defendant escaped and fled from the deceased, as he could, and finally when cornered he shot his adversary.

■ ■ The jury before whom this case was tried in the court below would probably have acquitted the defendant but for the prejudicial effect of certain incompetent, illegal, irrelevant, but very prejudicial testimony against the defendant, which was admitted in evidence over his apt, timely and emphatic objections thereto. The ruling of the trial court upon the admission of this testimony is assigned by the appellant in the well prepared and pertinent brief of his counsel, and it is asserted that the testimony of the State's witnesses, Miss Ethel Pate and Mrs. Loveless, to the effect that the defendant fired his pistol into the bed room, or in the bed room, where his wife was then changing her clothes, at a time some forty-five minutes, or an hour, before the commencement of the difficulty between the defendant and the deceased, and in no wise connected therewith or explanatory thereof, was not only erroneously admitted in evidence by the trial court, but that its admission was damaging to the defendant in the extreme and that its prejudicial effect was never eradicated from the minds of the jury.

Miss Ethel Pate, over the objection and exception of the defendant, testified, as a witness for the State, that about forty-five minutes, or an hour, before the defendant and his guests had supper, on the night of the fatal difficulty, the defendant, while under the influence of intoxicating liquor, "shot the gun in the room where his wife was." Immediately after this statement was made the defendant moved the court to exclude the same from the consideration of the jury. The trial court denied and overruled defendant's motion and the defendant then and there duly and legally excepted. The State's Solicitor then propounded to this witness the following question: "Q. You say the defendant fired a shot there some time before that."

The defendant objected to said question upon the grounds that the testimony sought to be elicited by said question was incompetent, irrelevant, immaterial, illegal and not a part of the res gestæ; that it had not been shown that there was then any ill will or hard feeling between the deceased and the defendant; that it was not shown that the shooting of the pistol at the time inquired about had anything to do with the shooting of the deceased, which happened an hour or so later; that it was not shown that there was then any quarrel, any row between the defendant and the deceased; and that it was not shown that said shot was fired at the deceased. The court overruled defendant's objection to said question and the defendant duly and legally excepted. Thereupon the witness answered that the defendant did fire a pistol shot there in the room where his wife was, about an hour before the difficulty in which the deceased was shot, and that at this time the defendant appeared to be under the influence of intoxicating liquor. The trial court admitted said testimony in evidence over the objection and exception of the defendant and refused to exclude the same from the consideration of the jury, to which action of the trial court the defendant duly and legally excepted.

Mrs. Elois Loveless, wife of the deceased, a State's witness, testified, among other things, that the defendant's wife left the kitchen, before supper was served, and went to bed, but got up after she had retired because the defendant told her to get in the kitchen and make some biscuits. At this point in her testimony this witness was asked this question by the State's Solicitor: "Q. Did the defendant fire a gun there at that time?" The defendant objected to said question upon the grounds that it called for testimony which was incompetent, irrelevant, immaterial and illegal and not a part of the res gestæ. The trial court overruled defendant's said objection and the defendant then and there duly and legally excepted. Thereupon the witness answered, "Yes sir." And continuing the witness testified that she had had occasion to observe people under the influence of intoxicating liquor and that at this time the defendant was drinking, but not drunk.

1. It would be hard, indeed, to conceive of testimony more prejudicial and damaging to the defendant's right to a fair and impartial trial, according to the rules of law

and of evidence of force and effect in this State, than that above referred to. The defendant was not on trial for shooting at, or assaulting his wife. He was being tried for the unlawful homicide of Mr. Homer Collins Loveless, the deceased. In the case of Brown v. State, 20 Ala.App. 39, 100 So. 616, 617, this Court said: "Under the procedure in this state, a person accused of crime is required, upon trial, to answer only the specific charge contained in the accusation, whether by complaint or indictment, and none other." And again in the same case we said:

"When prejudicial illegal testimony has been admitted, it is always a serious question as to how far such testimony, though withdrawn in the most explicit and emphatic manner, has injuriously affected the defendant. In the case of Maryland Casualty Co. v. McCallum, 200 Ala. 154, 75 So. 902, the Supreme Court said: 'This court has always regarded the practice with cautious disapproval.'

"We cannot approve the practice here indulged, however unintentional it may have been; for to do so would result in establishing a precedent which in many cases might be hurtful in the extreme. The question under discussion is a simple one, elementary in its nature, and has been dealt with so often by the appellate courts of this state, it should be a familiar proposition of law to every attorney at the bar and certainly to all trial judges; and to the solicitors who represent the state in the trial of criminal cases. It is not proper practice to burden a defendant's case by introducing in evidence patently illegal, irrelevant, inadmissible, and prejudicial facts, and allow this evidence to remain with the jury * * * until all the testimony is in, and then to simply tell the jury not to consider it. As stated in Cassemus v. State, 16 Ala.App. 61, 75 So. 267, 'The poison that had been injected would be difficult to eradicate.'"

In the case at bar no effort, whatever, was made by the trial court to withdraw said testimony, but on the contrary it remained with the jury and under the court's general oral charge the jury was required to consider this testimony in arriving at their verdict as to the guilt or innocence of the defendant. That the testimony now under consideration was illegal and that its admission in evidence was prejudicial to the defendant we entertain no doubt. In the case of Wise v. State, 11 Ala.App. 72, 66 So. 128, 130, this Court said: "The difficulty between the defendant and Patrick cannot be said, under the circumstances shown, to constitute a part of the res gestae of the act of homicide; it did not constitute one continuous transaction with it, nor was it substantially contemporaneous, so as to make the details of this difficulty with a third party admissible as illustrating the character of the main fact, or crime charged. State v. Stallings, 142 Ala. 112, 38 So. 261."

In the case of Duncan v. State, 22 Ala. App. 382, 115 So. 856, this Court said: "The testimony on behalf of the state tended to show that appellant assaulted the injured party without provocation. That on behalf of appellant tended to the effect that the injured party was himself the aggressor. In this state of the case we think it was prejudicial error for the court to allow, over defendant's objection, the witness Gaylor to state that defendant 'stuck his knife under several fellows' noses and told them to smell it.' The objections to the questions calling for this testimony pointed out the fact that they were not predicated on the time of the difficulty, or any time so related thereto that the testimony called for could be said to be of things or matters of the res gestae thereof. Without. no predicating the testimony, it clearly appears that this testimony was immaterial and irrelevant. Madry v. State, 201 Ala. 512, 78 So. 866. And its admission no doubt tended to discredit with the jury appellant's story of the encounter."

It is, therefore, the opinion and judgment of this court that the court below committed prejudicial error in the admission of said testimony against the defendant. Cadle v. State, 27 Ala.App. 519, 175 So. 327; Ratliff v. State, 19 Ala.App. 505, 98 So. 493; Booth v. State, 22 Ala.App. 508, 117 So. 492; Pelham v. State, 23 Ala.App. 359, 125 So. 688; Patterson v. State, 23 Ala.App. 428, 126 So. 420.

2. During the progress of the trial in the court below while Mrs. Loveless, wife of the deceased and a witness for the State, was testifying, she made the following statement: "During the time we were cooking there was some corn spilled on the stove. Charlie (the defendant) spilled the corn on the stove." Here the State's Solicitor propounded to this witness the following questions: "Q. Did Charlie make any remark about the mess that was on the stove at this time? A. Yes sir.

Q. What did he say, Mrs. Loveless?" The defendant objected to the last question just noted upon the ground that said question called for incompetent, irrelevant, immaterial and illegal testimony, not a part of the res gestae, hearsay testimony, which wouldn't tend to explain or shed any light on the shooting some forty minutes later. Thereupon the presiding judge of the trial court said: "I don't know whether the answer would be competent or not." The Solicitor then said: "We expect the answer to be 'there would be a bigger mess than that before the night was over.'" And thereupon the trial court overruled the defendant's objection to said question and the defendant duly and legally excepted. And thereupon the witness answered: "He said to let it go, there would be a bigger mess than that before this was over." And continuing the witness testified: "We ate supper then. From the time that remark was made by the defendant until my husband was shot, it was about twenty, or twenty-five minutes; long enough for us to eat. I don't remember the exact minutes."

We think, and it is the judgment of this court, that the above testimony was palpably erroneous and that it carried with it an insiduous, injurious and unfair inference against the defendant. Here was the defendant and the wife of the deceased, in the defendant's kitchen cooking supper, both friendly and in a good humor, when the defendant clumsily spilled a portion of the food being cooked upon the stove, and on being asked by the wife of the deceased if he wanted the spilled corn cleaned off the stove, replied: "Let it go, there will be a bigger mess than that before this is over." What were these two talking about? They were talking about the cooking, the preparation of supper and the necessary creation thereby of the disorder, disarrangement and untidiness, aptly called "mess," usually and ordinarily arising in the cooking of a meal. It is reasonably insisted what the defendant obviously meant was that in the finishing of the cooking and preparation of supper and in the eating thereof more untidiness would be created in the kitchen than then existed and that it would be better to await the consumption of the supper and then clean up the entire mess than to try to clean it up by piece meal. And that he was not, by this reply, trying to convey to the wife of the deceased information to the effect that he had thought over, deliberated and determined upon the shooting of her husband. That he was not then trying to impress upon her the fact that he cherished hatred, ill will and animosity against her husband. The reply of the defendant to Mrs. Loveless cannot by any reasonable mental process, or interpretation, be distorted into the declaration of a threat against Mr. Loveless directly, or against a class to which Mr. Loveless belonged. But the trial court admitted said testimony and with it the inferences that might be drawn therefrom, including those we have mentioned, and thereby further burdened the defendant's case by admitting in evidence an illegal, irrelevant, inadmissible and prejudicial statement and allowed the same to remain with the jury and to be considered by them in determining whether or not the defendant was guilty of an unlawful homicide.

In the case of Stokes v. State, 17 Ala. App. 27, 81 So. 363, this Court said: "The rule is that threats made by the defendant, * * * having no reference to the party assaulted, are not admissible on a trial charging the defendant with an assault. George v. State, 145 Ala. 41, 40 So. 961, 117 Am.St.Rep. 17. While the question asked by the solicitor was general and indefinite, the error might have been cured had the response shown a threat directed at the party assaulted; or if it had shown a general threat at a class to which the party assaulted belonged. The answer did neither, but tended to prejudice the minds of the jury against the defendant on his trial." It is the judgment of this court that the trial court erred in overruling the defendant's timely objection to said question and that the testimony elicited by said question was incompetent and illegal testimony and prejudicial to the defendant. McCoy v. State, 232 Ala. 104, 166 So. 769; Roper v. State, 25 Ala.App. 397, 147 So. 201.

The controlling question in all criminal prosecutions is the guilt or innocence of the person accused. In the determination of this question a trial court must see to it that the accused is accorded a fair and impartial trial. A judgment of conviction cannot be permitted to stand upon appeal, unless it affirmatively appears that the trial of the accused in the court below proceeded throughout without substantial error. Taylor v. State, 22 Ala.App. 428, 116 So. 415.

Because of the errors, hereinabove noted, the judgment of conviction from which this appeal was taken is hereby reversed and the cause is remanded.

Reversed and remanded.